**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

REGINALD D. LOCKHART,                                               PLAINTIFF

V.                                    CASE NO.: 4:24-CV-143-JM

CITY OF LITTLE ROCK, ET AL.                                        DEFENDANTS

<u>**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT**</u>

NOW COMES Plaintiff, REGINALD D. LOCKHART ("Plaintiff"), and for his Response to the Motion for Summary Judgment filed by Defendants, CITY OF LITTLE ROCK, ERIC PETTY and KENNETH WILCOX ("Defendants") states as follows:

## I.      INTRODUCTION AND STATEMENT OF PERTINENT FACTS

In April 2019, Plaintiff, who is black, was a 12-year veteran with the City of Little Rock's ("City") Streets Division with practical, hands-on experience in every aspect of the Heavy Equipment crew of which he was Leader. See Declaration of Reginald Lockhart, attached hereto as Exhibit 7, at ¶ 1. In April 2019, his supervisor, Jim Carloss, retired, and City announced the job opening for Carloss' Supervisor I position which would continue to oversee the Heavy Equipment crew and which described the job requirements, such as experience with air compressors, jackhammers and asphalt rollers. See Ex. 6 at 2. The Supervisor I job description stated that one year of lead worker experience is equal to one year of supervisory experience. See Ex. 6 at 2.

Around that time, Carloss told Plaintiff that he was retiring, and also stated his belief that Plaintiff was likely next in line for his soon-to-be vacated Superior I position based on Plaintiff's experience with heavy equipment.  See Ex. 7 at ¶¶ 2-3. Indeed, in April 2019, Plaintiff had twelve (12) years of heavy equipment experience, several years of stellar employment evaluations and he had even secured a letter of recommendation from a well-respected City supervisor, which he

submitted with his application. See Ex. 7 at ¶ 4; see George Bridge Recommendation Letter, attached hereto as Exhibit 13.

On April 29, 2019, Plaintiff was interviewed by a Streets Division interview panel selected by Defendant, Kenneth Wilcox ("Wilcox"), the Superintendent of the Streets Division, which is a division within Public Works. The panelists were Wilcox, Darrell Romes, Calvin Johnson and Melissa Allen.

Around this time, Wilcox moved the Supervisor I in charge of the concrete crew, Norman Stanley, from the concrete crew and put him in Carloss' vacated Supervisor I position over heavy equipment. See Ex. 3 at 69:20-24; 75:9-16. Now, the vacant Supervisor I position was the one heading the concrete crew, which is an entirely different focus than heavy equipment. See Ex. 2 at 52:13-22; see Ex. 3 at 70:24-71:2. A person like Plaintiff who has more relevant experience with heavy machinery than with concrete would be better qualified for the job vacated by Carloss than the job vacated by Stanley. See Ex. 2 at 52:23-53:4; 54:15-55:2. Plaintiff had less experience with concrete. See Ex. 2 at 64:9-10.

Despite the prior focus of the vacated spot, none of the questions Plaintiff was asked involved the operation of heavy equipment. See Ex. 7 at ¶ 10. The ten other applicants were also interviewed by the interview panel. After the interviews, the panel ranked Dale Lester, who is white, highest and he was offered the promotion to Supervisor I. Plaintiff believes Wilcox intentionally switched the focus of the open Supervisor I position after the job posting in order to nullify Plaintiff's relevant experience and box him out of the promotion. See Ex. 2 at 63:17-64:1. Wilcox admits he has the informal authority to do this but says he did not. See Ex. 2 at 64:2-5. Petty admits that the situation was not normal. See Ex. 3 at 69:25-70:2.

On September 25, 2019, PLAINTIFF filed Charge of Discrimination No. 493-2019-02070 with the EEOC.  On April 7, 2020, Plaintiff filed suit alleging violations of Title VII of the Civil Rights Act of 1964, specifically, 42 U.S.C. Section 2000e-5, *et. seq.,* ("Title VII"), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution which forbids racial discrimination by governmental actors and the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101, *et. seq.* which protects Arkansas citizens from deprivation of the equal protection of law guaranteed them under the Arkansas state constitution.  See Doc. #1. Plaintiff re-filed this lawsuit on February 16, 2024. See Doc. #1.

Plaintiff alleges he was more qualified for the Supervisor I position than Lester, and that the City's interview panel process is impermissibly subjective and unregulated and, thus, highly susceptible to discriminatory hiring decisions to exclude blacks violation of Title VII, the Fourteenth Amendment and ACRA. In short: 1) there is no interview panel criteria; 2) there is no set list of interview questions; 3) there is no uniformity to the panelists' approach; 4) there is no uniformity to type of questions asked by panelists—or even whether questions will be asked; 5) there are no guidelines (or, alternatively, interview guidelines are disregarded[1]); and 6) there no objective testing in the equipment used by the crew the supervisor is to supervise. Further, Plaintiff alleges that Wilcox's moving of Stanley from concrete to heavy equipment was an intentional act designed to greater disadvantage Plaintiff by making him more susceptible to succumb to the subjective pitfalls of the interview panel process.

Plaintiff submits that he can satisfy *McDonnell Douglas* in this race-based employment discrimination case. The true issues before this Court, then, are whether Defendants have

---

[1] See Plaintiff's Exhibit 12 at 11 ("Hiring authorities must follow the Interview Guidelines published by the Human Resources Department."). Eric Petty testified that the City does not provide any policies, guidelines or suggestions regarding the interview panel process. See Ex. 3 at 56:14-18.

articulated a credible non-discriminatory reason for the failure to promote Plaintiff, and whether Plaintiff can show that this proffered reason is a pretext for the discrimination of which he complains. At the heart of this controversy is the interview panel process used to determine that Plaintiff was not the most qualified applicant for the Supervisor I position in April 2019.

Plaintiff complains that this impermissibly subjective interview process allowed Wilcox and his co-defendants, Eric Petty ("Petty") and the City, to discriminate against him, costing him a promotion he was more qualified than Lester to receive.  Public Works Department ("Public Works") Director, Jon Honeywell, acknowledges the subjectivity of the promotion process, and further admits there is nothing to prevent the panelists, including Wilcox, from manipulating the process by unfairly scoring an applicant low for arbitrary reasons. See Ex. 1 at 55:21-25.

Thus, that the process is entirely subjective is all but universally conceded. Petty, who is the Public Works Operations Manager, testified at each panelist can have their own criteria and that there is no criteria imposed by the City that would prevent a panelist from giving any applicant whatever points he or she wants to give. Ex. 3 at 88:1-6. There is no uniformity among the panelists in how applicants are ranked. See Ex. 3 at 88:12-16. There is no mechanism at the City which makes sure that rankings are not made on an impermissible basis. See Ex. 3 at 26:5-9.

Wilcox agrees that the City's ranking system permits panelists to rank applicants for supervisor positions based on inappropriate factors. See Ex. 2 at 40:11-15. For instance, a panelist could arbitrarily blackball anybody wearing a red shirt, and there would be no way for the City to prevent that or be aware of it. See Ex. 3 at 26:10-20. It totally is up to the panelists how they wish to come up with their scores or what goes into them. See Ex. 3 at 26:10-20.

The failure to have an established criteria or mechanisms in place to root this out means that people who wish to racially discriminate can do so without the City being able to determine

its existence or being able to prevent it. See Ex. 1 at 56:1-57:10. Defendants have admitted all of

these facts. Therefore, the only question that remains is whether Defendants' denials of race

discrimination are credible under the circumstances—whether their claims of good faith acting

are truthful—which is inherently a credibility question for the jury. See *Westcott v. Crinklaw*, 68

F.3d 1073, 1076 (8th Cir. 1995).  "At the summary judgment stage, the court may not make

determinations about the credibility of witnesses or the weight of the evidence."  See *Cline v.

Union County*, 182 F.Supp.2d 791, 795 (S.D. Iowa 2001) (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249, 106 S.Ct. 2505 (1986); see also 3 *Weinstein's Federal Evidence* § 601.03[2][a]

at 601-13 (Joseph M. McLaughlin ed., 2d ed. 2000).

## II.    LEGAL STANDARDS

Summary judgment is appropriate only when there is no genuine issue of material fact, so

that the dispute may be decided solely on legal grounds.  *Holloway v. Lockhart*, 813 F.2d 874 (8th

Cir. 1987); Fed. R. Civ. P. 56.  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), the

Supreme Court has promulgated a simple guideline to assist courts in determining whether a

summary judgment movant has met the summary judgment standard:

> The inquiry is the threshold inquiry of determining whether there is
> a need for trial—whether, in other words, there are genuine factual
> issues that properly can be resolved only by a finder of fact because
> they may reasonably be resolved in favor of either party.

The Eighth Circuit Court of Appeals warns that summary judgment should be invoked

carefully so that no party will be improperly deprived of a trial of disputed factual issues.  See

*Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S.

991 (1979).  The Eighth Circuit established the burden of the parties in connection with a summary

judgment motion:

> [T]he burden on the moving party for summary judgment is only to
> demonstrate, *i.e.*, '[to] point out to the District Court,' that the record
> does not disclose a genuine dispute on a material fact. It is enough
> for the movant to bring up the fact that the record does not contain
> such an issue and to identify that part of the record which bears out
> his assertion. Once this is done, his burden is discharged, and, if the
> record in fact bears out the claim that no genuine dispute exists on
> any material fact, <u>it is then the respondent's burden to set forth
> affirmative evidence, specific facts, showing that there is a genuine
> dispute on that issue</u>. If the respondent fails to carry that burden,
> summary judgment should be granted.

*Counts v. M.K. Ferguson Co.*, 862 F.2d 1338, 1339 (8th Cir. 1988) (emphasis added)(quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988)).

Only disputes concerning facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. The Court is required to view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. See *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). If there exists conflicting evidence pertaining to the motivation for an employee's discharge, upon which reasonable men and women might differ, courts will find sufficient evidence of pretext to survive a motion for summary judgment. See *Hocevar v. Purdue Frederick Co.*, 223 F.3d 721, 727 (8th Cir. 2000).

### III.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO PROMOTE DISCRIMINATION CLAIM UNDER THE FOURTEENTH AMENDMENT, SECTION 1983 AND THE ARKANSAS CIVIL RIGHTS CLAIM

A plaintiff bringing a claim for race discrimination can survive a motion for summary judgment by presenting admissible evidence that either directly indicates unlawful discrimination or indirectly creates an inference of unlawful discrimination. See *Gibson v. American Greetings*

*Corp.*, 670 F.3d 844, 853 (8th Cir. 2012). If a plaintiff presents indirect evidence, then a court must analyze the claim under the *McDonnell Douglas* burden shifting framework. *Id.*

Under Title VII, there are two separate but related theories available to prove a prima facie case of employment discrimination: disparate treatment and disparate impact. *Catlett v. Missouri Highway & Transp. Com.*, 589 F. Supp. 929, 940, 1983 U.S. Dist. LEXIS 11123 at *31 (W.D. Mo. December 5, 1983). Disparate treatment is the most easily understood type of discrimination. *Id.* The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. *Id.* Proof of discriminatory motive is critical, although it can be inferred from the mere fact of differences in treatment. *Id.* Undoubtedly, disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII. *Id.* (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S. Ct. 1843, 1854 (1977)). Section 1983 claims for race discrimination are subject to *McDonnell Douglas* analysis. See *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir. 2003)

By making a *prima facie* case of disparate treatment, a plaintiff raises an inference of "discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Id.* (quoting *Furnco Construction Co. v. Waters*, 438 U.S. 567, 579-80, 98 S. Ct. 2943, 2951 (1978)). The establishment of a *prima facie* case "creates a legally mandatory rebuttable presumption of discrimination." *Jones v. International Paper Company and United Paperworkers International Union*, 720 F.2d 496, 500 (8th Cir. 1983). A plaintiff can utilize statistics to establish a *prima facie* case of disparate impact discrimination. *Royal v. Missouri Highway and Transportation Commission*, 655 F.2d 159, 162 (8th Cir. 1981).

A *prima facie* showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion. See *Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696, 702 (8th Cir. 1980). The evidentiary obligation of the defendant "is limited to a burden of production." *Jones*, 720 F.2d at 500. To dispel the adverse inference from a *prima facie* showing of disparate treatment, the employer need only articulate a legitimate, non-discriminatory reason for the plaintiff's treatment. *Furnco Construction Co.*, 438 U.S. at 577-78, 98 S. Ct. at 2950.

If the employer does articulate a justification reasonably related to the achievement of a legitimate goal, the plaintiff must show that the defendant's articulated reason is a mere pretext for discrimination. *McDonnell Douglas v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817 (1973). Statistical evidence is relevant to a claim of disparate treatment and statistics showing a general pattern of discrimination are probative on the question of whether the reasons given for a particular action are pretextual. *Bauer v. Bailar*, 647 F.2d 1037, 1045 (10th Cir. 1981). The burden of persuasion remains on the plaintiff, who must convince the trier of fact by a preponderance of the evidence that the challenged employment practice is discriminatory. *Kirby*, 613 F.2d at 703.

Under ACRA, an individual is "to be free from discrimination because of race…This right shall include, but not be limited to: the right to obtain and hold employment without discrimination." A.C.A. § 16-123-107(a). Claims under ACRA for employment discrimination are analyzed in the same manner as employment discrimination claims under Title VII of the Civil Rights Act of 1964. See *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703-704 (8th Cir. 2005); *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009).

Plaintiff concedes that his Title VII claims have expired, and also concedes that the allegations pertaining to the denial of promotions  between September 2019 and July 2020 are time-barred because they were not brought in Plaintiff's original complaint filed in 2020.

8

Nonetheless, Plaintiff proceeds in the matter under the Fourteenth Amendment, Section 1983 and ACRA, focusing on the denial of the applied-for Supervisor I promotion in April 2019. See *Henley v. Brown*, 686 F.3d 634 (8th Cir. 2012).

### A. Plaintiff Can Show Intentional Discrimination with Circumstantial Evidence

A plaintiff can survive summary judgment by presenting admissible evidence that directly indicates unlawful discrimination. See *Gibson*, 670 F.3d at 853. While it is true that workplace demographics alone are not direct evidence of discrimination strong enough to establish a causal link[2], when combined with knowledge that subjective hiring and promotion practices results in discriminatory trends. See *Catlett*, 589 F. Supp. at 946. Here, Petty has admitted that black Public Works employees are more likely to be seriously disciplined than their white counterparts because they occupy a disproportionate percentage of laborers, compared to supervisors. See Ex. 3 at 85:12-23. Put another way, because there are fewer black supervisors, black Streets Division employees are more likely than whites to face serious discipline:

> Q:  Okay. Thank you. And if you include the really serious kind of stuff like suspensions and terminations, it's 81 percent black, 19 percent white. So that being said, assuming this document is accurate, is it not a fair statement to say -- and by the way, to agree to my statement that I'm about to say doesn't mean that the folks on this list didn't do the thing that they were accused of doing. But what I'm saying is, is you agree with me that black people are over represented on this disciplinary actions list when compared to their overall numbers?
>
> A:  There are more, yes, that got disciplinary actions than whites. Yes.

<div align="center">*****</div>

---

[2] See *Noreen v. PharMerica Corp.*, 833 F.3d 988, 994 (8th Cir. 2016) (mere recitation of statistics without some evidence tending to show that they indicate a meaningful phenomenon does not show discriminatory motive.).

Well, what this does not take into account is the position.

Q:    What do you mean?

A:    What you would find is your laborers are the ones that are disciplined the most.

Q:    Well –

A:    Your supervisors are not disciplined, but your laborers are. Now, if you look at the percentage of laborers, you'll find it's over 90 percent black, and that's where all your attendance and personnel issues are.

*****

Q:    So because black people are more relegated to the non-supervisory positions, they tend to be disciplined more?

MR. PRITCHARD: Objection. Go ahead.

A:    Laborers have a worse attendance and more personal personnel problems than your supervisor positions, in that your supervisor positions are almost never disciplined because of their attendance. They're your longer term employees, and they don't have to work on the crews with the others. But your laborers work on four-person crews at a very low pay, picking up litter or doing your ditching. So your laborers are who is over percentage on going to be getting your disciplinary action. And our labor percentage is over 90 percent black, so that is the reason you're going to see the 80 percent on your discipline of black.

See Ex. 3 at 51:11-53:20

Petty's testimony here, when combined with the overly subjective nature of the promotion process which dictates whom among Public Works employees can elevate to positions where they are not disciplined nearly as frequently establishes intentional discrimination. See Catlett, 589 F. Supp. at 946.

**B.  Plaintiff Also Can Make a *Prima Facie* Showing of Discrimination Under *McDonnell Douglas***

If a plaintiff presents indirect evidence, then a court must analyze the claim under the *McDonnell Douglas* burden shifting framework. *Gibson*, 670 F.3d at 853. Under this framework, in a hiring or promotion case, in order to establish a *prima facie* case of discrimination, a plaintiff must show:

> (1) he is in a protected class; (2) he was qualified for an open position; (3) he was denied that position; and (4) the [employer] filled the position with a person not in the same protected class.

*Dixon v. Pulaski County Special Sch. Dist.*, 578 F.3d 862, 867-868 (8th Cir. 2009).

    1.  As a City Employee of African American Heritage, Plaintiff is a Member of a Protected Class

Plaintiff is a black man, and it therefore cannot be disputed that he is a member of a protected class. See Plaintiff's 2019 EEOC Charge, attached hereto as Exhibit 5, at 1. See e.g., *Davis*, F.3d at 704 ("Davis, as an African-American, is a member of a protected class."). Plaintiff has therefore satisfied the first *McDonnell Douglas* element.

    2.  Plaintiff was Qualified for the April 20219 Supervisor I Position for Which He Applied

In April 2019, Plaintiff was interviewed for a vacant Supervisor I position in the City's Streets Division. See Ex. 3 at 59:15-60:1. Petty has testified that if an applicant like Plaintiff is interviewed, it signifies that the applicant is qualified for the position being sought, a premise with which Petty agrees. See Ex. 3 at 34:15-35:2; see *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011)("It is undisputed that Torgerson and Mundell, by making the eligibility list, were qualified for the firefighter positions which were filled by non-Native American males."). Plaintiff has therefore satisfied the second *McDonnell Douglas* element.

### 3.   Despite his Qualifications, Plaintiff was Denied the Supervisor I Promotion

It is uncontroverted that Plaintiff did not get the Supervisor I promotion he sought in April 2019. See Ex. 3 at 66:11-24. He has therefore satisfied the third *McDonnell Douglas* element. See *McCullough v. Real Foods*, 140 F.3d 1123, 1127 (8th Cir. 1998).

### 4.   Dale Lester, a Caucasian American, Who was Similarly Qualified, was Given the Supervisor I Position

Where candidates for a position are both qualified for the position, for the purposes of establishing a *prima facie* case, a plaintiff has shown the candidates are similarly situated. See *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 757 (8th Cir. 2003)(finding candidates similarly situated where both meet the minimum qualifications for the position). A plaintiff's burden here is not onerous. See *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004). It is established that Lester was offered the April 2019 Supervisor I promotion. See Ex. 4 at 96:12-18. Plaintiff has therefore satisfied the fourth *McDonnell Douglas* element. With this evidence, Plaintiff has made a *prima facie* showing of race discrimination.

### C.   **Plaintiff Can Show Defendants' Purported Non-Discriminatory Reason for Denying Him the Supervisor I Position in April 2019 was Pretextual**

If a plaintiff has made a sufficient *prima facie* claim of discrimination under *McDonnell Douglas*, the burden then shifts to the defendant to offer a non-discriminatory reason for its action in order to rebut a plaintiff's claim. *Gibson*, 670 F.3d at 854. If the defendant presents a non-discriminatory rationale for firing the plaintiff, then the burden shifts back to the plaintiff to prove that the non-discriminatory reason offered by a defendant is simply a pretext for a racially motivated discharge. See *Gibson*, 670 F.3d at 854. Proof of pretext, coupled with a strong *prima facie* case, may suffice to create a triable question of fact. *Torgerson*, 643 F.3d at 1046.

12

First, Plaintiff can show that Defendants' purportedly non-discriminatory reasons for not promoting Plaintiff are not worthy of credence. Defendants claim that Plaintiff was not promoted because he had less supervisory experience than Lester. See Ex. 2 at 74:12-17. According to Wilcox, supervisory experience is key, and only applicants' supervisory experience, experience in paperwork, reports and personnel issues are pertinent. See Ex. 2 at 60:17-21; 33:25-34:4.

However, this reasoning is severely undermined by the fact that Lester was chosen over Kevin Page who, according to Defendants, had considerably more supervisory experience than Lester. See Ex. 2 at 60:17-21. Moreover, Page had not recently been convicted of sexual assault—was not a convicted felon—as was the case with Lester in April 2019. See Ex. 11 at 18.

Defendants also claim Plaintiff was not promoted in April 2019 because he did not rank higher than Lester based on criteria that Petty cannot even explain. See Ex. 3 at 66:12-24. This determination was not based on relevant experience. It was not based on seniority. It was not based on employee evaluations. It was entirely based on the interview panel scores which are based on nothing. See Ex. 3 at 61:23-62:12. There is no criteria for the interview panel process. Even though City policy requires hiring authorities to follow the Interview Guidelines published by the Human Resources Department, Petty testified there are no guidelines regarding the interview panelists' questions. See Ex. 12 at 11; see Ex. 3 at 33:13-20. But there are such guidelines, as reflected in the City's own administrative policies. See Ex. 12 at 11. Therefore, it is in violation of express policy that the City does not provide any policies, guidelines or suggestions regarding the interview panel process. See Ex. 3 at 56:14-18.

So, Defendants have it all backwards: the panelists' scores are not based on qualifications; their purported qualifications are based on the scores. Thus, circularly, if you are able to score the best in this subjective process, you are *de facto* the most qualified:

Q:    Do you think that there's any–do you think that the
      subjective criteria that members are able to use whenever
      they see fit–do you think that that can lead to manipulating
      the results so that lesser qualified people who are preferred
      for whatever reason get the jobs?

A:    That would be the definition of lesser qualified. It's up to
      that panelist to decide who is the most qualified for this job,
      and that does not have to do with just experience or just
      seniority or just how they answer questions. The most
      qualified is up to that individual person on that panel.

Q:    So if that person ranks somebody as number one for
      whatever reason, then that person is the most qualified?

A:    In that panelist's opinion. See Ex. 3 at 61:23-62:12.

Defendants also claimed that Plaintiff was not promoted because he lacked supervisory experience. Wilcox says he scored Page highest because of his supervisory experience, even though it was not related to Streets Division but rather a City golf course. See Ex. 2 at 60:17-21. However, Defendants' position here is completely contradicted by the evidence of record. Kevin Page also had substantially more supervisory experience than Lester, and yet Lester was given the promotion. Page even had more seniority than Lester. See Ex. 2 at 60:4-6. Defendants cannot explain why Lester prevailed over Page. See Ex. 2 at 60:7-13.

1. The City's Public Works' Promotion Process is Extremely Subjective and Lacks Any Meaningful Oversight

Director Honeywell cannot rule out that the Public Works' interview ranking process is entirely subjective. See Ex. 1 42:9-11. There are no objective or written down guidelines or criteria panelists follow. See Ex. 3 at 23:16-20. HR does not prepare any questions for applicants. See Ex. 3 at 39:10-12. The City does not provide any policies, guidelines or suggestions regarding the interview panel process. See Ex. 3 at 56:14-18. Panelists may score applicants unfairly based on any whims. See Ex. 1 at 54:20-55:1. Honeywell admits that there could be problems with a

promotional system that allows arbitrary scoring and is not subject to oversight. See Ex. 1 at 78:23-79:2.

a. Interview Panel Process is Extremely Subjective With Basically No Criteria

Each panelist determines on their own whether seniority is a factor to consider, whether they value total experience or just seniority with the City. It would be up to each individual panelist, whether seniority was a big or small issue for them. See Ex. 3 at 23:21-24:4. Some panelists might rank an applicant first because of seniority, while another panelist might not give any regard to seniority. See Ex. 24:5-15. There is no criteria that would prevent a panelist from giving any applicant whatever points he or she wants to give. See Ex. 3 at 19-25. Each panelist can have their own criteria. See Ex. 3 at 88:1-6. There is no uniformity among the four panelists in how the applicant is ranked. See Ex. 3 at 88:12-16. If there was a tie between applicants, Wilcox could decide to use experience as the tiebreaker. See Ex. 2 at 7-10. There is no rule, so if there was a tie, he could use any criteria he wished to break the tie. See Ex. 2 at 43:17-45:11. That is part of the subjectivity of the process. See Ex. 2 at 45:12-14.

If Wilcox harbored animus toward an applicant and ranked them low for inappropriate reasons, he would never have to explain his actions to anyone. See Ex. 2 at 40:4-10. He agrees that the City's ranking system allows for inappropriate bases to be used to rank applicants for supervisor positions. See Ex. 2 at 40:11-15. Someone could say "I'm not ranking anybody who wears a plaid shirt higher than a 4" and there would be no way to ferret that out unless the person admitted it. See Ex. 2 at 40:16-21.

Wilcox agrees that the City's system allows arbitrary results that are not based on qualifications. See Ex. 2 at 40:22-41:3. There are no mechanisms at Public Works in 2019-21 to prevent panel members from manipulating the scoring system so that they could award jobs to

people they liked versus people they don't like. See Ex. 1 at 54:10-55:1. Petty admits the system

allows for a panelist with racial animosity to rank the most qualified applicant who is black lowest

without recourse. See Ex. 3 at 29:22-30:6. Moreover, any panelists' decision based improperly on

race would not be detectable and could be concealed. See Ex. 3 at 30:7-18. An applicant's

promotion hinges entirely on the subjective interview process:

> Q:     Is there any type of a percentage that is awarded for getting
>        the highest ranking after the interview panel? Or by and
>        large, if you get the highest ranking for the interview panel,
>        you're going to get the offer?
>
> A:     The best score from the interview panel is who gets the offer
>        with the exception of that one time, which I mentioned
>        previously.  See Ex. 3 at 37:3-9.

The rankings from the April 2019 interview panel indicate both discriminatory and

arbitrary results. See Image No. 1 below; see Ex. 10.

| Rank | Applicant | Kevin Wilcox WM | Melissa Allen BW | Calvin Johnson BM | Darrell Romes BM | Score |
|------|-----------|-----------------|------------------|-------------------|------------------|-------|
| 1 | Dale Lester WM | 2 | 3 | 1 | 1 | 7 |
| 2 | Kevin Page WM | 1 | 2 | 2 | 3 | 8 |
| 3 | John Ball WM | 3 | 1 | 3 | 2 | 9 |
| 4 | Ricky Davis BM | 6 | 4 | 9 | 4 | 23 |
| 5 | Larry C. Adams WM | 4 | 9 | 4 | 8 | 25 |
| 6 | Gordon Brown WM | 7 | 10 | 5 | 5 | 27 |
| 7 | Reggie Lockhart BM | 8 | 8 | 6 | 6 | 28 |
| 8 | Michael Burress BM | 5 | 6 | 7 | 10 | 28 |
| 9 | Sammy Williams BM | 9 | 7 | 8 | 9 | 33 |
| 10 | Michael Canaday BM | 10 | 5 | 10 | 11 | 36 |
| 11 | Curtis Stehle WM | 11 | 11 | 11 | 7 | 40 |

**Image No. 1: Grid Showing Interview Panel Scoring/Ranking for April 2019 Supervisor I Promotion**

The April 2019 interview results are discriminatory insofar as white employees occupy 6

of the top 7 rankings out of 11 candidates. *Id.* this is proof that the City's promotion process—

even if race-neutral—has a disparate discriminatory impact. These rankings are arbitrary insofar

as the scores given by the interview panelists do not reflect any cohesive or reasoned analysis of

the candidates' qualifications. How is it that the same applicant, Ricky Davis, scored #4 out of 11

candidates with Melisssa Allen but also a #9 out of 11 with Calvin Johnson? How is it that Gordon Brown scored #5 out of 11 with Darrell Romes but also #10 out of 11 with Melissa Allen? How is it that Michael Canaday scored #5 out of 11 with Melissa Allen but also placed dead last at #11 out of 11 with Darrell Romes?  And, again, if supervisory experience is as singularly crucial as Wilcox claims, then how did Lester, who has less such experience, outrank Page?

      b.   <u>The City Rejects Traditional Criteria to Determine Whether the Chosen Candidate is Truly Most Qualified Which Shows Deliberate Indifference</u>

There is no interview process criteria—Wilcox does not advise the interview panelists on any criteria for them to use. See Ex. 2 at 28:11-16. There is no uniformity in the approach taken by the individual panel members when they're deciding how to rank the applicants. See Ex. 2 at 28:17-24.  Sometime some of the interview panelists ask questions and sometimes they do not. See Ex. 2 at 75:17-20.  According to Petty, there are no guidelines for the types of questions panelists ask. See Ex. 3 at 33:13-20. Not all applicants are asked the same questions. See Ex. 3 at 33:22-34:2. There is not a list of questions that all applicants are asked. See Ex. 3 at 34:3-5. Wilcox says he uses lists for questions—he had a list of preset questions for the April 2019 Supervisor I interview he said he "just got rid of them since there was nothing written on them after them after the interviews were done." See Ex. 2 at 29:2-17.

When Petty runs interview panels, he does not even use a list of questions. See Ex. 3 at 34:6-14. The applicants are not asked questions in the same order. See Ex. 3 at 35:3-7. There is no objective measure for the Supervisor I position, not even testing. See Ex. 3 at 68:20-69:1. Employee evaluations do not play any role whatsoever in the supervisor 1 promotional process. See Ex. 2 at 56:21-23; See Ex. 3 at 55:17-20. According to Wilcox, seniority does not play a role in his rankings for Supervisor I positions—his rankings were purely based on experience. See Ex.

2 at 41:12-15. There is no evidence that letters of recommendation from a respected supervisor

factor in. See Ex. 1 at 36:16-18.

        c. <u>The City Could Administer a Fair, Objective Promotion Process but
Choses Not to, Showing Deliberate Indifference</u>

        There is no mechanism at the City which makes sure that rankings are not made on an

impermissible basis. See Ex. 3 at 26:5-9. If the City wanted to, it could devise an objective,

predictable formula for the ranking system. See Ex. 2 at 63:2-5. The City could devise a system

where factors are broken down into percentages See Ex. 2 at 63:6-11. Such a system would allow

people to look back and determine whether there was a legitimate basis for the rankings. See Ex.

2 at 63:12-16. The City could have panelists write down the reason for ranking an applicant the

way they did which would be a way to document or memorialize the bases for panelists ranking

applicants as they did. See Ex. 2 at 39:13-21. But the City does not do this. See Ex. 2 at 39:22-23.

The City does not make sure panelists are not ranking applicants based on inappropriate reasons.

See Ex. 2 at 39:24-40:3.

        Punitive damages may be awarded for intentional discrimination by an employer who acts

with malice or reckless indifference to protected rights. See *Canny v. Dr. Pepper/Seven-Up*

*Bottling Group, Inc.*, 439 F.3d 894, 903 (8th Cir. 2006). Malice or reckless indifference refers to

an employer's state of mind and their knowledge that their action may be violating federal law.

See id. (citation omitted). *Sterling*, 2022 U.S. Dist. LEXIS at \*15. Plaintiff is entitled to punitive

damages under A.C.A. § 16-123-107(b)[3]. See *Odom Antennaes v. Stevens*, 61 Ark. 182, 188, 966

S.W.2d 279 (1998).

_____

[3] Any person who is injured by an intentional act of discrimination in violation of subdivisions
(a)(2)-(5) of this section shall have a civil action in a court of competent jurisdiction to enjoin
further violations, to recover compensatory and punitive damages, and, in the discretion of the
court, to recover the cost of litigation and a reasonable attorney's fee. A.C.A. § 16-123-107(b

2.  <u>Defendants' Use of Impermissibly Subjective Criteria for Promotions Allows Racially Motivated Hiring and Promotion Process</u>

The overly subjective nature of an employer's stated promotion criteria serves as a basis for denial of summary judgment. See *McCullough*, 140 F.3d at 1129 ("Critical to our analysis in this case is the extremely subjective nature of the employer's stated promotion criteria."). A non-objective promotional system may be probative of intentional discrimination, especially when discriminatory patterns result "because such systems operate to conceal actual bias in decision-making." See *Harris v. Ford Motor Co.*, 651 F.2d 609, 609 (8th Cir. 1981); see also *Satz v. ITT Financial Corp.*, 619 F.2d 738, 746 (1980). Here, Petty admits the system allows for a panelist with racial animosity to rank the most qualified applicant who is black lowest without recourse. See Ex. 3 at 29:22-30:6.

This is similar to *Catlett,* in which the court found that a state highway commission's interview process: 1) was highly susceptible to discriminatory hiring decisions system; 2) was unregulated; and 3) operated to exclude women violation of Title VII by the use of a subjective and vague standards. *Catlett*, 589 F. Supp. at 945. Chief among the problems identified by the court were the lack of written or verbal guidelines on hiring procedures, lack of objective criteria to delineate the factors relevant to the hiring decision and the unlimited discretion in evaluating the applicants. *Id.* The court concluded here that "[d]ue to the absence of guidelines to regulate the selection process, the hiring decisions…were arbitrary and subjective…" *Id.*; see *Stewart v. General Motors Corp.*, 542 F.2d 445 (7th Cir. 1976)(promotion process with no written guidelines to delineate relevant criteria for promotion lacked objective standards and was therefore highly susceptible to abuse). The instant case is like *McCullough* and *Catlett*. It is unlike *Torgerson*.

In *Torgerson*, a plaintiff who applied for a firefighter position and was rejected filed a race discrimination lawsuit, alleging the discrimination was manifested in the subjective nature of part

of the hiring process, specifically the [interview] panel and interviews. See *Torgerson*, 643 F.3d at 1047. He also claimed the city arbitrarily used different standards during the interviews which constituted disparate treatment. *Id.* While the court ultimately rejected the plaintiff's claims, the opinion granting summary judgment was enlightening as to what type of institutional criteria will defeat such claims.

In *Torgerson*, the challenged hiring process encompassed a multi-phase process with written and physical-agility phases, as well as the release of a set of likely interview questions provided by Human Resources. *Torgerson*, at 1037-38. In that case, the interviewers attended a class instructing them how to ask questions and what responses are considered good responses. *Id.* at 1037. The interviewers received scoring criteria to use in rating candidates' responses. *Id.* The identical questions were asked of each applicant in the same order by the same interviewer. *Id.* The panelists scored the candidates' responses to each interview question on a scale of 1 to 10. *Id.* The questions were given to the candidates before the interview, along with a list of the qualities to which the questions related. *Id.* Based on the scoring from the three phases of the process and veteran's points (another objective factor), each of the Torgerson candidates was then placed in rank order on an eligibility list. *Id.* The City does none of this.

Unlike the employers in *Torgerson*, Public Works does not assign points or percentages to various phases of a multi-phase process.  See Ex. 3 at 37:3-9. Instead, the City rejects the use traditional, reliable criteria for filling the Supervisor I position, the type of which the court in *Torgerson* noted as indispensable to its finding. The City does not use a multi-phase scoring system with built-in checks and balances. There is no oversight.

3.  The City's Own Internal Documents Demonstrate a Pattern of Race
    Discrimination Stemming from the Interview Panel Process

One of the ways a plaintiff may demonstrate a disproportionately impact on minorities in an employer's hiring process is through the use of statistics. See *Green v. Missouri Pacific Railroad*, 523 F.2d 1290 (8th Cir. 1975).  The City's Streets Division has a long history of discrimination on the basis of race whereby blacks are severely underrepresented among supervisory employees. See Ex. 3 at 50:2-11; see Ex. 7 at ¶ 5. This fact is supported by a June 2019 petition Plaintiff circulated which contained dozens of signatures of employees who claimed they experienced workplace discrimination at Public Works. See Plaintiff's June 2019 Workplace Petition, attached hereto as Exhibit 9; see Ex. 7 at ¶ 6. This is a fact which is also strongly supported by the City's own internal documents. See Ex. 3 at 48:19-49:3; see Ex. 8.

These internal City documents are statistics showing that even though blacks represent the majority of Streets Division employees, their numbers in terms of supervisor positions is disproportionately low. See Ex. 8 at 1-6. Specifically, 70% of street operation employees are black and 30% are white. See Ex. 3 at 42:15-24. On its face, a City document indicates that 72% of supervisors are white and 28% are black. See Ex. 8 at 6; see Ex. 3 at 43:15-20. But if one looks at August 2019, the month that black supervisor Darrell Romes retired, there were 10 white supervisors and only 1 black supervisor, which reflects that white supervisors accounted for 91% of all supervisors in August 2019. See Ex. 3 at 44:1-48:3.  Petty had to agree that the City's own statistics do not rule out race discrimination and, indeed, are actually consistent with allegations of race discrimination alleged by Plaintiff. See Ex. 3 at 68:1-13.

D.  **Plaintiff Alleges and Can Prove a Disparate Impact Claim Under Section 1983 and ACRA**

Claims based on the disparate impact theory of employment discrimination involve employment practices that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Catlett*, 589 F. Supp. at 941 (quoting *International Brotherhood of Teamsters v. United States*, 431 U.S. at 335-36 n. 15. To make a *prima facie* case on a disparate impact claim, a plaintiff need not show that the employer had a discriminatory intent but need only demonstrate that the particular practice results in a discriminatory effect. *Catlett*, 589 F. Supp. at 941-942.

The plaintiff need only show that an employment practice operates to exclude a protected class to show disparate impact. *Id.* at 942. Once a plaintiff has established the disparate impact, the burden shifts to the employer to demonstrate that the practice has a manifest relationship to the employment in question. *Kirby*, 613 F.2d at 703. If the employer proves that the challenged practices are justified by business necessity, the plaintiff may then demonstrate that other employment practices lacking a similar discriminatory effect would satisfy the employer's legitimate interest in efficient and trustworthy workmanship. *Id*.

Central to the disparate impact theory is the existence of "an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in substantially, if not completely, comparable ways." *Id.* (quoting Stastny, 628 F.2d at 273). The plaintiff must establish by a preponderance of the evidence that discrimination was the employer's standard operating procedure—a regular practice rather than an unusual one. International Brotherhood of Teamsters, 431 U.S. at 336.

Here, Defendants claim unequivocally that race had nothing to do with the April 2019 interview panel process undergone by Plaintiff. See Ex. 2 at 75:21-24. They say that none of the

questions asked of Plaintiff were about race or related to race and, therefore, the argument goes, the City's interview panel process is race-neutral. See Doc. #11 at 11 (¶ 33). But these assertions are unavailing because the City's own internal documents demonstrate that this employment practices—promotions through the interview panel process—results in disproportionately low numbers of black supervisors within Public Works. See Ex. 8 at 6.

These internal City documents are statistics showing that even though blacks represent the majority of Streets Division employees, their numbers in terms of supervisor positions is disproportionately low. See Ex. 8 at 1-6. Specifically, 70% of street operation employees are black and 30% are white. See Ex. 3 at 42:15-24. On its face, a City document indicates that 72% of supervisors are white and 28% are black. See Ex. 8 at 6; see Ex. 3 at 43:15-20. But if you look at August 2019, when Darrell Romes retired, there were 10 white supervisors and 1 black supervisor, which reflects that white supervisors accounted for 91% of all supervisors in August 2019. See Ex. 3 at 44:1-48:3.

IV.   **CONCLUSION**

Plaintiff humbly submits that multiple genuine issues of material fact exist in the present controversy with which a fully informed jury should wrestle. Therefore, summary judgment is inappropriate. Therefore, Plaintiff respectfully requests that the Court deny Defendants' motion.

<div style="margin-left: 40%;">

Respectfully submitted,

Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFF
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com

</div>